UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES TURK**, *et al.*, | : | **Case No. 09-CV-868** |
| **Plaintiffs,** | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| **v.** | : | |
| **DANIEL COMERFORD**, *et al.*, | : | **MEMORANDUM & ORDER** |
| **Defendants.** | : | |

Before the Court is Defendants Nick Rexing, Daniel Comerford, Jason Stasenko, and Mark Adams' Motion for Summary Judgment (Doc. 107). This Motion has been fully briefed and is ripe for adjudication. For the reasons articulated below, Defendants' Motion for Summary Judgment is **GRANTED** in part, and **DENIED** in part.

I.     **BACKGROUND**

   A.     **Factual Background**[1]

   Plaintiffs allege that their constitutional rights were violated on February 17, 2009, when members of an FBI administered task force – the Cleveland/Cuyahoga Fugitive/Gang Task Force ("the CCFGTF") – invaded Plaintiffs' home without a warrant in search of a fugitive named John Mattice. Mattice had been charged with rape on October 28, 2009. It is undisputed that Plaintiff James Turk was seen with Mattice at the scene of the alleged rape on February 13, 2009 – four (4) days prior to the encounter at the Turks' home.

---

   [1]The following facts are derived from the Amended Complaint, Answers, the parties' briefing, as well as all of the parties' submissions, and are construed in the light most favorable to Plaintiffs, as this Court must when deciding a motion for summary judgment.

1. **The Parties**

Plaintiffs James and Mary Beth Turk have been married for twenty-four years and reside in Strongsville, Ohio with the two youngest of their five children – WKT and KMT.  James Turk ("Mr. Turk") is a former Strongsville police officer who is currently self-employed as a licensed private investigator.  Mary Beth Turk ("Mrs. Turk") has been a school teacher for twenty-nine years and is currently employed by the Cleveland Board of Education teaching special education.  (Doc. 115-2, Mrs. Turk Aff., at ¶ 2.)

At this stage in the proceedings, the only remaining Defendants are four individually-named task force members: Nicholas Rexing, Jason Stasenko, Daniel Comerford, and Mark Adams[2] ("the Individual Defendants").

2. **The CCFGTF's Efforts to Locate Fugitive John Mattice**

On October 28, 2009, John Mattice was arrested by the Cleveland police for rape.  (Doc. 107-5, Stasenko Decl., at ¶ 3.)  Mattice failed to attend a court appearance, and the court issued a bench warrant for his detention.  (*Id*.)  As a result, the CCFGTF began searching for Mattice.

On February 10, 2009, task force officers ("TFO") Jason Stasenko and Mark Adams went to 3900 Fulton Court, in Cleveland, Ohio, which was listed on the arrest warrant as Mattice's address and was the site of the alleged rape.  (*Id*.)  While at the 3900 Fulton Court address, TFOs Stasenko and Adams spoke to a woman who: (1) informed them that Mattice no longer lived there; and (2) provided the name of Mattice's former girlfriend.  (*Id*. at ¶ 4.)  The former girlfriend subsequently contacted Stasenko and indicated that she might be able to assist the CCFGTF in

---

[2]Plaintiffs misidentified Defendant Adams as "Adam Adams" in the original complaint. This error was corrected in the Amended Complaint.

locating Mattice.  (*Id*.)

Stasenko spoke with the former girlfriend several times between February 10, 2009 and February 13, 2009.  During one of their conversations, the former girlfriend stated that "Mattice had grown suspicious that she was helping the police, that she feared for her safety, and that she no longer believed she could assist [the task force] in locating Mattice."  (*Id*. at ¶ 5.)

### 3.      Mr. Turk's Interaction with Mattice on Friday, February 13, 2009

Mr. Turk was working at the direction of attorney Ed Heffernan when he met John Mattice on February 13, 2009.  At Mr. Heffernan's request, Mr. Turk traveled to 3900 Fulton Court with Mattice to photograph the alleged crime scene.

When they arrived at 3900 Fulton Court, Mr. Turk and Mattice were met at the door by a current occupant named Emily.  (Doc. 107-4, J. Turk Dep., at 26:5-21.)[3] Mr. Turk identified himself as a private investigator working for an attorney and gave Emily two business cards: one was his personal card and the other had both his name and Ed Heffernan's name on it.  Mr. Turk asked Emily for permission to enter and "to take a picture of the couch where an assault allegedly took place." (*Id*. at 28:7-10.)  After Emily let them in, Mr. Turk took the photograph, left, dropped Mattice off, and traveled to Akron to work on another case.  According to Mr. Turk, he was at 3900 Fulton Court for less than two minutes.  (Doc. 115-3, Mr. Turk Aff., at ¶ 4.)

TFO Stasenko's declaration paints a somewhat different picture of Mr. Turk's visit to 3900 Fulton Court.  On February 13, 2009, Stasenko received a call from the former girlfriend indicating

---

[3]The deposition transcripts filed with the Court have two different page numbers on the same page: (1) the page number of the original document; and (2) the page number imprinted at the top of the page by the Court's CM/ECF system.  Although the parties cite to the deposition page numbers, for clarity and consistency with the Court's citation to other docket entries, the Court cites to the page numbers from the Court's CM/ECF system.

that "Mattice and an individual who identified himself as J. Turk, an investigator with 'J. Turk International,' came to 3900 Fulton Court while she was there."  (Doc. 107-1 at 14; Doc. 107-5, Stasenko Decl., at ¶ 6.)  During this conversation, the former girlfriend indicated that Mr. Turk "was pushy, pushed his way into the house, and asked to see the couch where the alleged offense occurred."  (*Id*.)  She indicated that she "was scared and intimidated."  (*Id*.)  She also stated that Mattice and Mr. Turk left together in the same vehicle.  (*Id*.)

Mr. Turk denies that he was pushy or intimidating and states that he videotaped the encounter to protect himself against false claims that he entered without consent and threatened or intimidated anyone into talking.  (Doc. 107-4 at 75:20-76:7.)

Mr. Turk estimates that he spent a total of an hour or two with Mattice on February 13, 2009.  (Doc. 107-4, J. Turk Dep., at 24:23-25:5.)  This was the only contact he had with Mattice.  At the time, Mr. Turk did not know Mattice was a fugitive or that he had been charged with rape.  He also did not know that Emily was Mattice's former girlfriend.  (*Id*. at 68:8-69:10.)  It was not until Sunday, February 15, 2009, when he read an article in the Plain Dealer featuring Mattice as the fugitive of the week, that Mr. Turk learned Mattice was a fugitive wanted for rape.  (*Id*. at 34:2-36:7.)

### 4. The CCFGTF Researches James Turk

After his conversation with Mattice's former girlfriend, TFO Stasenko ran "J. Turk" through the National Criminal Information Center, obtained the name James Turk, and ran it through the Ohio Law Enforcement Gateway.  (Doc. 107-5, Stasenko Decl., at ¶ 7.)  This search revealed an address at 16964 Woodleaf in Strongsville, Ohio.  (*Id*.)  TFO Stansenko also ran James Turk's name through the Cuyahoga County Common Pleas Court docket and discovered that Mr. Turk was

4

previously charged with intimidation but was found not guilty.  (*Id.*)

### 5.    The February 17, 2009 Incident at the Turks' Home

On February 17, 2009 at 6:45 a.m., the CCFGTF arrived at the Turks' home in Strongsville to "interview James Turk concerning the whereabouts of John Mattice and to look for fugitive Mattice, since Turk was the last person known by law enforcement to have been with Mattice." (Doc. 107-5, Stasenko Decl., at ¶ 10.)  It is undisputed that the TFOs had an arrest warrant for Mattice but no warrant to search the Turks' home.

Although Mr. Turk surreptitiously recorded the majority of the encounter on audiotape via a digital recorder in his underwear, it is undisputed that the recording starts a few seconds *after* the initial interaction between the parties.  The Court has, however, had an opportunity to listen, first-hand, to the audio recording of the events in question and to review the transcript submitted by the parties.[4]

Upon arrival at the Turks' home, TFO Comerford went to the back of the house to "cover" in the event that Mattice was present and tried to escape.  (Doc. 107-11, Comerford Decl., at ¶ 6.) Similarly, TFO Rexing "walked to the right side of the house and then proceeded to the left side of the house" in an effort "to establish a loose perimeter in the event the fugitive was present, to prevent his escape and protect the safety of officers on the scene."  (Doc. 107-9, Rexing Decl., at ¶ 7.)

Although the parties agree that the officers knocked on the front door and that TFO Stasenko

---

[4]The parties agree that the audio tape recording accurately portrays the parties' conversations, and that, although the transcript does not capture everything on the tape, it is a "fair visual aid to the actual evidence."  (*See* Doc. 107-5 at ¶ 17; Doc. 115-3 at ¶¶ 21-23; Doc. 115-2 at ¶ 21.)  Because both parties rely on the transcript of the recording and neither party contests its admissibility, the Court can properly consider it.

yelled for Mr. Turk to open the door, they disagree as to what happened next.[5]  According to Mrs. Turk, "nobody opened the front door." (Doc. 107-3, Mrs. Turk Dep., at 47:2-3.) She claims that, "[w]hen Jim went to unlatch the deadbolt he never turned to open or maybe it was pushed, there were then people in my house immediately." (*Id*. at 47:6-11.) Similarly, Mr. Turk testified that he "attempted to comply with the police order to open the door, but never did.  I was manipulating the deadbolt, when Defendant Stasenko and other officers pushed the door open and came through the doorway, invading our house." (Doc. 115-3, J. Turk Aff., at ¶ 11.) According to Mr. Turk, the Individual Defendants did not ask for permission to enter the home and neither he nor Mrs. Turk consented to the initial entry of their home. (*Id*. at ¶ 12.)

According to TFO Stasenko, Mrs. Turk opened the door and let the officers into the foyer. Specifically, he recalls her saying words to the effect of "come inside, I have neighbors." (Doc. 107-5 at ¶ 12.) To the contrary, Mrs. Turk maintains that she "never opened the front door" and "did not greet the Task Force at the front door or give permission to law enforcement to enter the foyer." (Doc. 115-2, Mrs. Turk Aff., at ¶¶ 6-7). According to Mrs. Turk, the TFOs were already in the foyer before she said anything directed to the officers. (*Id*. at ¶ 9.)

It is undisputed that Stasenko entered the home first, followed by Adams and Chapman.[6] TFO Rexing subsequently entered the home. (Doc. 115-3 at ¶ 13.) The parties agree that TFO Comerford received a radio call from TFO Stasenko and entered the house several minutes after the

---

[5]Mr. Turk describes the front door of the home as a set of two doors, where the right door is "a dummy door" that does not open. (*See* Doc. 107-4 at 41:15-18, "So I went to open the door and what they don't know is that double door, the right one, is a dummy door, it does not open."). The front door opens into the foyer of the Turk home; there is no second door or set of doors separating the entryway from the rest of the home. (*See* Doc. 107-3 at 45:15-46:2.)

[6]Plaintiffs voluntarily dismissed TFO Chapman from this lawsuit on December 18, 2009.

other officers.  (Doc. 107-11, Comerford Decl., at ¶ 7; Doc. 107-4, J. Turk Dep., at 47:23-48:15.)

Each of the TFOs were dressed in plain clothes and were wearing vests marked with the initials of

their particular law enforcement agency.[7]

According to Mr. Turk, he initially thought the officers were at his house for the family dog.

(Doc. 107-4, J. Turk Dep., at 39:11-24.)  Specifically, Mr. Turk indicated that he thought TFO

Stasenko's hat – which bore the initials "APA" – stood for Animal Protective League.  When

Stasenko told Mr. Turk to put the dog away, Mr. Turk responded: "Oh, I thought you said you're

here for the dog."  (Doc. 107-12 at 2:4-8.)  The next statements on the recording are as follows:

> MRS. TURK: Go through the entire house.
>
> OFFICER: Okay.
>
> MRS. TURK: Get your people out of my front lawn.
>
> MR. TURK: Wait a minute.  Wait a minute.  Wait a minute.

(Doc. 107-12 at 2:9-15; *see also* Doc. 115-3, J. Turk Aff., at ¶ 16 ("While Defendants spoke to my

spouse Beth about searching the house, I told law enforcement three times to 'wait a minute.'")  TFO

Stasenko grabbed Mr. Turk's wrist and moved him towards the back of the foyer away from Mrs.

Turk and their son, WKT.  (Doc. 115-3, J. Turk Aff., at ¶ 14.)  The other TFOs went toward Mrs.

Turk.  Stasenko explained that they: (1) were from the Fugitive Task Force; (2) were looking for a

fugitive rapist; (3) knew Mr. Turk was with him[8] on Friday; and (4) wanted to know where he was

---

[7]TFO Stasenko was wearing a vest bearing the initials "APA" (Adult Parole Authority) on the front and "Police" on the back.  (Doc. 107-5 at ¶ 11.)  TFO Adams was wearing a vest marked "Sheriff's Department."  (Doc. 107-10 at ¶ 7.)  TFO Rexing was wearing a ballistic vest with FBI on the front and back.  (Doc. 107-9 at ¶ 5.)  Finally, TFO Comerford was wearing a vest marked "Sheriff's Department" and a knit hat marked "Sheriff."  (Doc. 107-11 at ¶ 4.)

[8]It is unclear from the record whether the TFOs specifically referred to Mattice by name.  The parties dispute whether the officers showed Mrs. Turk a photograph of Mattice.  Resolution

and whether he was in the house:

OFFICER:      You were with him on Friday, right?  Don't lie to me or you're going to jail.  You understand?

MR. TURK:    On the advice of my attorney - - can I call my attorney?

OFFICER:      You can call your attorney after we're done with you, okay.

MRS. TURK:  (Inaudible) Go through my house - -

(Doc. 107-12 at 3:11-20.)

A few moments later, Mr. Turk told the TFOs that it was "fine" for them to search around:

MR. TURK:    We're going to be very cooperative.

MRS. TURK:  I have my daughter sleeping in the back room.

OFFICER:      She said we could search around.  We're going to take a look, make sure he's not here.

MR. TURK:    That's fine.

(Doc. 107-12 at 5:14-21.)

Mr. Turk subsequently asked to see a search warrant:

MR. TURK:    What a minute.  Do you have a search warrant?

OFFICER:      No, we have an arrest warrant.

MR. TURK:    Can I see it, please?

OFFICER:      Yeah, it's in the car . . . Technically, by law, we don't have to show you anything.  We have an arrest warrant - -

MR. TURK:    Right.

_____

of this factual dispute is not necessary because it does not affect the outcome of this case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

8

> OFFICER:        - - For the fugitive's arrest and you were the last one to see him on Friday.
>
> MR. TURK:    He doesn't live here.

(Doc. 107-12 at 7:8-22.)  Mrs. Turk then told her husband to stop talking.  (*Id*. at 8:3-7.)  She testified that she wanted the officers to get out of her house and she "knew the only way that I would ever get them out would be to do what they said to do and that was to go through and make sure that this rapist was not in my house."  (Doc. 107-3, Mrs. Turk Dep., at 72:3-9.)

Mrs. Turk called attorney Heffernan and gave the phone to Mr. Turk.  In the meantime, she began showing two or three of the TFOs around the house, starting in the kitchen.  (Doc. 107-3 Mrs. Turk Dep. at 57:2-58:12.)  While on the phone with Mr. Heffernan, Mr. Turk told the officers that "my attorney said if you don't show me an arrest warrant you're going to have to leave."  (Doc. 107-12 at 8:21-23; *see also* Doc. 115-3, J. Turk Aff., at ¶ 17.)  At Mr. Turk's invitation, TFO Stasenko got on the phone with Mr. Heffernan.  During his conversation with Mr. Heffernan, Stasenko explained that they were looking for a fugitive rapist:

> OFFICER:        All right.  I'm letting you know that we're here - - they gave us consent to search, they're cooperating with us, okay.  I told him that if he doesn't cooperate he's going to jail based on investigative purposes of the Sheriff's Department.
>
> *               *               *
>
> OFFICER:        We have a warrant for this guy's arrest, okay.  If he turns himself in today, great.  All right.  We don't have to bother any more people.  Your client was with him on Friday, okay.  That's why we're here.  We have information - - listen.  We have information from other sources that he was with him, okay.  This gives us enough to come out here and talk to him, okay. . . They gave us consent to search, said he's not here, that's fine, and then they called you.

(Doc. 107-12 at 14:9-15; 14:19-15:4; 15:11-14.)  Mr. Heffernan told TFO Stasenko that "he believed John Mattice was going to arraignment that morning at 9:00 at Cuyahoga County Court of Common

Pleas."  (Doc. 107-5, Stasenko Decl., ¶ 13.)

While TFO Stasenko was on the phone, Mrs. Turk repeatedly told the other officers to go through the house.  (Doc. 107-12 at 9:25-11:1; *see also* Doc. 107-3, Mrs. Turk Dep., at 55-56.)  At one point, Mr. Turk said, "wait a minute, wait.  Wait until he's done talking to Ed."  (Doc. 107-12 at 11:15-16.)  He then offered coffee to the TFO officers and told his wife: "Beth, they're just doing their job, they're mistaken."  (*Id*. at 11:19-25; *see also* Doc. 107-5, Stasenko Decl., at ¶ 14.)[9]  Mrs. Turk testified that, although her husband told her to wait, she proceeded with the search because she wanted the officers to leave.  (Doc. 107-3, Mrs. Turk Dep., at 57:2-23.)

Throughout the entire encounter, Mr. Turk remained in the foyer area with TFO Stasenko.[10]  According to Mr. Turk, he was detained against his will and thought he was under arrest.  (Doc. 107-4, J. Turk Dep., at 44:12-18.)  TFO Stasenko informed Mr. Turk that he was not under arrest but cautioned him that he could be arrested if he lied.  (Doc. 107-5, Stasenko Decl., at ¶ 15.)  Although TFO Stasenko threatened Mr. Turk with handcuffs, it is undisputed that Mr. Turk was never handcuffed during the encounter.  (Doc. 107-4, J. Turk Dep., at 45:9-24.)

When the officers asked Mr. Turk about his interaction with Mattice, he repeatedly said he could not recall what happened on Friday and he declined to answer any questions relating to

---

[9]During his deposition, Mr. Turk testified that he was merely being sarcastic when he offered coffee to the officers.  (Doc. 107-4 at 57:19-58:1.)

[10]There is some dispute as to what Mr. Turk was wearing during the encounter.  Mr. Turk testified that he was wearing an undershirt and briefs.  (Doc. 107-4 at 49:19-50:11.)  Although Defendants argue that Mr. Turk later testified that he was not sure whether he was wearing pants, Defendants failed to provide the Court with the relevant pages of Mr. Turk's deposition containing that testimony.  Mrs. Turk testified that she did not recall whether Mr. Turk was wearing pants during the encounter.  (Doc. 107-3 at 45:10-14.)  The audio recording of the encounter reveals that Mr. Turk asked if he could "finish getting dressed," and was told by an officer that he was "dressed enough for us to do our thing."  (Doc. 107-12 at 12:14-13:3.)

Mattice.  (Doc. 107-5, Stasenko Decl., at ¶ 13.).  In fact, when the officers told Mr. Turk they had

a witness who saw him with Mattice on Friday, Mr. Turk claimed that they "got some bad

information."  (Doc. 107-12 at 34:5-11.)  In response, the TFOs informed Mr. Turk that, although

they did not want to arrest him, they would take him into custody for obstructing justice and

intimidating a crime victim.  (*Id.* at 27:8-17 ("Our goal is not to arrest you. . . . if I have to arrest you

I will.  I don't want to."); *see also id.* at 37:6-15.)  Mr. Turk testified that he was being sarcastic

when he told the officers that he could not remember being with Mattice on Friday.  (Doc. 107-4,

J. Turk Dep., at 57:2-14.)

     At some point, someone called Mr. Heffernan a second time.  This time, TFO Comerford

spoke with Mr. Heffernan and was informed that Mattice would be attending an arraignment later

that morning at the Cuyahoga County Court of Common Pleas.  (Doc. 107-11, Comerford Decl., at

¶ 7.)  The TFOs told both Mr. Heffernan and Mr. Turk that, if Mattice attended his arraignment, that

would be the end of the issue.  If Mattice did not show up for court, however, Mr. Heffernan and Mr.

Turk would need to come downtown to talk to the agents.

     Although the Amended Complaint alleges that the Individual Defendants "assaulted

Plaintiffs" and "held Plaintiffs and their minor children against their will, including at gunpoint," it

is undisputed that the TFOs did not draw or point their weapons at anyone while at the Turks'

home.[11]  Mrs. Turk testified that neither she nor her children were physically touched but that TFO

---

[11]Although Mr. Turk testified that he saw an officer either holstering or un-holstering his
weapon and that his son, WKT, told him an officer in the backyard pulled his gun out, Plaintiffs
introduced no evidence that the officers pointed weapons at anyone.  (Doc. 107-4 J. Turk Dep. at
70:18-71:7.)  Indeed, Mrs. Turk testified that she did not see any officer take his gun out of its
holster and she did not see anyone point a gun at anyone.  (Doc. 107-3 at 82:2-9.)  Similarly, Mr.
Turk testified that no one pointed a gun at him.  (Doc. 107-4 at 71:20-22 ("Q: Did anybody point
a gun at you?  A. No.")).

11

Rexing threatened to tell the neighbors there was a fugitive in her house.  (Doc. 107-3, Mrs. Turk Dep., at 67:18-68:2.)  The only physical force alleged was when TFO Stasenko grabbed and held onto Mr. Turk's wrist.  (Doc. 107-4, J. Turk Dep., at 45:2-17; Doc. 107-12 at 4:13-17.)

The parties agree that the encounter at the Turks' home lasted roughly thirty minutes. Although Plaintiffs assert, without citation, that "James Turk repeatedly asked the officers to leave," the record reveals that neither Mr. Turk nor Mrs. Turk ever specifically ordered the TFOs to leave their home.[12]  (*See* Doc. 115 at 26.)  None of the Plaintiffs were arrested, and no charges resulted from the encounter.

### B.    Procedural History

On April 17, 2009, Plaintiffs James and Mary Beth Turk[13] filed an eleven-count complaint alleging violation of Ohio common law, federal law, and their constitutional rights, stemming from the task force members' conduct during the February 17, 2009 incident.[14]  (Doc. 1.)

In October 2009, Plaintiffs sought and obtained leave to file an Amended Complaint.  The Amended Complaint removed the state common law tort claims, added a new defendant – the Cuyahoga County Metropolitan Housing Authority ("CMHA") – and reduced the claims asserted

---

[12]The closest statement was Mr. Turk telling the officers "My attorney said if you don't show me an arrest warrant you're going to have to leave."  (Doc. 107-12 at 8:21-23.)  The next statements on the recording are Mr. Turk asking TFO Stasenko if he wanted to talk to his attorney, and Stasenko complying.

[13]Mary Beth Turk brings this action on her own behalf and on behalf of their two children, WKT and KMT, both of whom are minors.

[14]In the original Complaint, Plaintiffs named the following defendants: the task force members (individually and in their official capacities), the City of Cleveland, Cuyahoga County, the State of Ohio, and John Does 1-3.  On May 29, 2009, the State of Ohio filed an Answer and a separate Motion for Judgment on the Pleadings.  (Docs. 9 and 10.)  At the Case Management Conference on August 6, 2009, the Court granted the State of Ohio's Motion for Judgment on the Pleadings on sovereign immunity grounds.

12

down to the following four: (1) unconstitutional search and seizure in violation of the Fourth Amendment against the Individual Defendants (Count I); (2) failure to train and supervise against Defendant CMHA and Defendant Cuyahoga County Sheriff (Count II); (3) illegal policy and customs against Defendant CMHA and Defendant Cuyahoga County (Count III); and (4) a claim pursuant to the Supreme Court's holding in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) against the Individual Defendants (Count IV).

The Defendants named in the Amended Complaint can be divided into the following groups: (1) the task force members; (2) Cuyahoga County; (3) Cuyahoga County Metropolitan Housing Authority ("CMHA"); and (4) John Does 1-3 (law enforcement officers working for unknown agencies).  Plaintiffs filed a Motion to Dismiss CMHA and task force member William Chapman from the lawsuit (Doc. 85), which the Court granted as unopposed on December 18, 2009.

The United States filed a Notice of Substitution on October 28, 2009, seeking substitution in place of the Individual Defendants with respect to Plaintiffs' state constitutional and common law claims.  (Doc. 69.)  The United States contemporaneously filed a Motion to Dismiss the Amended Complaint on grounds that Counts I (42 U.S.C. § 1983) and IV (*Bivens*) are actually tort claims "dressed up" in constitutional terms.  (Doc. 70-1.)  In the Motion to Dismiss, the United States argued that, because Plaintiffs have not exhausted their mandatory administrative remedies under the Federal Tort Claims Act, 28 U.S.C. § 1346, *et seq.*, the Court does not have subject matter jurisdiction over any common law or tort claims.  In response, Plaintiffs clarified that they are not asserting any common law tort claims in the Amended Complaint, and that Counts I and IV allege constitutional deprivations.  (Doc. 83 at 3-4.)  Accordingly, on April 8, 2010, the Court issued an order denying the United States' Motion to Dismiss, finding that: (1) the Amended Complaint asserts no tort claims; (2) the Federal Tort Claims Act is not implicated; and (3) the Court has subject matter

13

jurisdiction over the Plaintiffs' claims.  (Doc. 99.)

After filing separate Answers to the Amended Complaint (Docs. 71, 73-75), the Individual Defendants filed the Motion for Summary Judgment now pending before the Court.  On August 23, 2010, Plaintiffs filed a memorandum in opposition to the Motion for Summary Judgment.  (Doc. 115.)  The Individual Defendants filed a Reply in Support on September 28, 2010 (Doc. 121).

On August 23, 2010, Plaintiffs voluntarily dismissed Defendant Cuyahoga County.  (Doc. 116.)  Because neither Cuyahoga County nor CMHA remain in the litigation, Counts II (failure to train and supervise) and III (illegal policy and customs) of the Amended Complaint are no longer live claims.

The only remaining claims are Plaintiffs' Fourth Amendment claims against the Individual Defendants: Count I (42 U.S.C. § 1983) and Count IV (*Bivens*).  In both counts, Plaintiffs allege that the Individual Defendants' violated their constitutional rights during the incident on February 17, 2009.  Because the Individual Defendants are deputized *federal* task force officers who were acting within the scope of their employment as *federal* officers at the time of the events alleged in the Amended Complaint, § 1983 – which permits suits against state officials – is inapplicable.[15]  As such, the only remaining claim is a Fourth Amendment *Bivens* claim seeking damages on grounds that the Individual Defendants deprived Plaintiffs of their constitutional rights to be free from unreasonable searches and seizures.  With respect to the damages sought, during the course of

---

[15]To establish a claim under § 1983, a plaintiff must show that he was deprived of constitutional rights by a person acting "under color of state law."  *Strickland v. Shalala*, 123 F.3d 863, 866 (6th Cir. 1997).  It is well-established that, "where an individual has been deprived of a constitutional right by a federal agent acting under color of federal authority, the individual may bring a so-called *Bivens* action for damages against that federal agent in an individual capacity."  *Farag v. United States*, 587 F.Supp.2d 436, 450 (E.D.N.Y. 2008) (quoting *Lombardi v. Whitman*, 485 F.3d 73, 78 (2d Cir. 2007)).

discovery in this case, Plaintiffs affirmatively waived any claim for emotional damages or distress and any claim for economic harm.  (Doc. 90.)

## II.     **STANDARD OF REVIEW**

The Individual Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  (Doc. 107.)  Under Rule 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In reviewing summary judgment motions, this Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).  A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Anderson*, 398 U.S. at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim. *Moldowan v. City of Warren*, 570 F.3d 698, 719 (6th Cir. 2009); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989).  The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the

essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curto v. Harper Woods*, 954 F.2d 1237, 1241 (6th Cir. 1992) (quoting *Celotex*, 477 U.S. at 322); *Ocean Innovations, Inc. v. Quarterberth, Inc.*, No. 1:03-CV-0913, 2009 U.S. Dist. LEXIS 54108, at *8-9 (N.D. Ohio June 26, 2009) (citing *Celotex*, 477 U.S. at 322).

In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted).  Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir. 2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether

16

there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.") (emphasis in original) (internal quotations omitted).

## III.  **QUALIFIED IMMUNITY FRAMEWORK**

As discussed herein, the Individual Defendants claim that their conduct during the February 17, 2009 incident is protected by the doctrine of qualified immunity.[16]  Qualified immunity is an affirmative defense that "shields government officials performing discretionary functions . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)) (internal quotations omitted).  The doctrine is designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were lawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

When an officer asserts qualified immunity, the burden shifts to the plaintiff to show that the defendant is not entitled to the defense. *Miller v. Admin. Office of Courts*, 448 F.3d 887, 894 (6th Cir. 2006); *see also Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) ("Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity.").  If the officer reasonably believed his conduct was not in

---

[16]Although this case involves claims under *Bivens*, not § 1983, the Supreme Court has held that "the qualified immunity analysis is identical under either cause of action." *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

violation of the plaintiff's rights, even if that belief was mistaken, he is entitled to qualified immunity. *See Pray v. City of Strongsville*, 49 F.3d 1154, 1158 (6th Cir. 1995) (noting that, "officials are entitled to qualified immunity when their decision was *reasonable*, even if mistaken") (emphasis in original, internal citation omitted).

Qualified immunity serves as both "a defense against liability" and "an entitlement not to stand trial or face the other burdens of litigation." *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001)). The United States Supreme Court has established a two-step analysis for determining whether a law enforcement officer is entitled to qualified immunity. *Saucier*, 533 U.S. at 201. First, the court must consider whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury . . . show [that] the officer's conduct violated a constitutional right." *Id*. Second, the court must determine whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id*. For a right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (internal citation omitted).

A motion for summary judgment on qualified immunity grounds must be granted unless the plaintiff can satisfy both prongs of the *Saucier* test.[17] *See Chappell*, 585 F.3d at 907. The Supreme

---

[17]The Sixth Circuit occasionally considers a third step in the qualified immunity analysis. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 n.2 (6th Cir. 2005) ("Panels of this court occasionally employ a three-step qualified immunity analysis, as opposed to the two-step analysis set forth here. As two recent opinions indicate, both the two-step approach and the three-step approach can be said to capture the holding of *Saucier*."). The third step, where utilized, requires inquiry into "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (citation and quotation omitted). Although the three-step approach may, in some instances, increase clarity, in many cases "if the right is clearly established, the conduct at issue would also be objectively

Court recently held that courts can exercise their discretion in determining "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).  In other words, a judge may skip ahead and decide whether the right at issue was "clearly established" without first addressing whether the right was violated.

## IV.     WHETHER THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY AS TO PLAINTIFFS' FOURTH AMENDMENT CLAIMS.

As previously indicated, the *Bivens* claim asserted in Count IV is the only claim at issue in this case.  A plaintiff seeking relief under *Bivens* must show violation of a constitutional right by a federal agent acting under color of federal law.  *Bivens*, 403 U.S. at 389.  Because the United States stipulates[18] that the Individual Defendants were, on the day in question, deputized as federal officers acting as members of an FBI task force, Plaintiffs' *Bivens* claim turns on whether the Individual Defendants' conduct during the February 17, 2009 incident violated their Fourth Amendment right to be free from unreasonable searches and seizures.

Plaintiffs contend that their Fourth Amendment rights were violated when the Individual Defendants unlawfully: (1) entered their home without a warrant, and without any exception to the warrant requirement; (2) searched the Turk residence without valid consent; and (3) seized Mr. Turk in his residence.

---

unreasonable." *Caudill v. Hollan*, 431 F.3d 900, 911 n.10 (6th Cir. 2006).  In such cases, the Sixth Circuit will collapse the second and third prongs of the analysis in order to "avoid duplicative analysis." *Id.*

[18]Indeed, the United States Attorney for the Northern District of Ohio, Steven M. Dettlebach, submitted a certification stating that the individually named Defendants "were acting within the scope of their employment as federal officers at the time of the incidents alleged in the Complaint." (Doc. 69-1.)

The primary issue presented in the Individual Defendants' Motion for Summary Judgment is that of consent.  Specifically, the Individual Defendants argue that they are entitled to qualified immunity because they had consent to enter the Plaintiffs' home and consent to search for fugitive Mattice.[19]  Defendants further argue that, even if Plaintiffs did not intend to consent, "or if they believed their consent was involuntary, the individual Federal Defendants reliance on the same did not violate clearly established law."  (Doc. 107-1 at 27.) As such, Defendants argue, Plaintiffs "cannot demonstrate a constitutional violation or that the individual Federal Defendants are not entitled to qualified immunity under *Pearson*." (*Id*. at 20.)

The Court begins its analysis by considering whether Plaintiffs were deprived of their constitutional rights under the Fourth Amendment when the Individual Defendants entered the residence, searched the residence, and briefly detained Mr. Turk in the foyer of his home during the search for fugitive Mattice.  If the allegations do not give rise to a constitutional violation, then the Plaintiffs' claims fail as a matter of law and the Individual Defendants are entitled to summary judgment.  If, however, the Plaintiffs sufficiently allege a constitutional violation, then the Court must determine whether the violated right was "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

---

[19]Defendants argue that TFO Stasenko obtained consent, and that officers Adams, Rexing, and Comerford are protected by the doctrine of "consent once removed."  (Doc. 107-1 at 28.)  Although Plaintiffs argue that Defendants did not have consent to enter and did not have voluntary consent to search, they do not specifically address the doctrine of "consent once removed" in their responsive briefing.  Therefore, to the extent Stasenko obtained voluntary consent (or at least reasonably believed under the circumstances that he obtained voluntary consent) – which Plaintiffs dispute – there is no dispute that the other officers were permitted to rely upon that consent.

A.    **The Officers' Initial Entry Into the Residence.**

In the Amended Complaint, Plaintiffs allege that the Individual Defendants "forcefully invaded and searched Plaintiffs' home without a search warrant" and without consent.  (Doc. 60 at ¶ 18.)  Although Defendants analyze the initial entry and subsequent search issues together, and seemingly did not think Plaintiffs asserted an unlawful entry claim, Plaintiffs clarify in their briefing that they are attacking both the initial entry and the subsequent search as separate and distinct constitutional violations.[20]  With respect to the initial entry, Plaintiffs argue that the officers had already breached their curtilage[21] and foyer before Plaintiffs had any opportunity to consent.  In contrast, the Individual Defendants contend that their warrantless entry into the Turks' home to search for fugitive Mattice was justified because they had consent to enter.

_____

[20]Specifically, Plaintiffs argue that: "The entry was a separate and distinct event from the discussions which later took place between Mrs. Turk and Defendants.  As no consent occurred at the initial entry, the entry was a warrantless trespass, in violation of the Fourth Amendment." (Doc. 115 at 19.)

[21]Although Plaintiffs do not mention curtilage in the Amended Complaint, in their briefing, Plaintiffs allege that the Individual Defendants breached the curtilage of their home in violation of their Fourth Amendment rights.  Curtilage has been defined as "the area outside the house which harbors the 'intimate activity associated with the sanctity of a man's home and the privacies of his life.'" *United States v. Hopper*, 58 Fed. Appx. 619, 623 (6th Cir. 2003) (quoting *Oliver v. United States*, 466 U.S. 170, 180-81 (1984)).  A warrantless entry into the curtilage surrounding a home is not unreasonable under the Fourth Amendment provided there is a legitimate law enforcement objective and the intrusion is limited.  *See United States v. Weston*, 443 F.3d 661, 666-67 (8th Cir. 2006).  For example, officers can enter the curtilage to engage in an investigative technique referred to as a "knock and talk."  *Hardesty v. Hamburg Township*, 461 F.3d 646, 652-54 (6th Cir. 2006).  In a "knock and talk" scenario, officers are permitted to "go to the front door to knock for purposes of speaking with the occupants or asking for consent to search the premises."  *Id*. at 653; *see also United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005) (recognizing "knock and talk" encounters "as a legitimate investigative technique at the home of a suspect or an individual with information about an investigation").  Here, it is undisputed that the officers went to the Turk's home to question Mr. Turk regarding Mattice's whereabouts and to obtain details about their previous interaction on February 13, 2009.  This type of "knock and talk" approach is permitted under the Fourth Amendment.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend. IV.  The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972).  It is well-established, however, that a person can consent to the warrantless entry into his home.  It is also well-settled that, absent exigency or consent, a law enforcement officer must obtain a search warrant in order to "search for the subject of an arrest warrant in the home of a third party."  *Steagald v. United States*, 451 U.S. 204, 205-206 (1981).

Consent "may be in the form of words, gesture, or conduct."  *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (quotation omitted).  Regardless of the form, for consent to be valid, it must be voluntary.  Whether consent is voluntary is a question of fact to be determined by the totality of the circumstances.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).  This inquiry, moreover, is "objective in nature so the court must look to the revealed circumstances of the encounter and not simply to the searched party's later testimony as to his consciousness at the time of the encounter."  *Aquino v. Honda of America, Inc*., 158 Fed Appx. 667, 673 (6th Cir. 2005).  The scope of an individual's consent turns on what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect[.]" *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 547 (6th Cir. 2003) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).  "As long as an officer has an objectively reasonable belief that the search was within the course of consent, the search is valid."  *Id*.; *see also Morales v. Boyd*, 304 Fed. Appx. 315, 319 (5th Cir. 2008) (finding that the officers were protected by qualified immunity because they "reasonably believed that they were executing the search pursuant to valid consent").

Here, it is undisputed that Mr. Turk was with fugitive Mattice on Friday, February 13, 2009,

and that, as a result, on February 17, 2009, the Individual Defendants went to Plaintiffs' home to talk to Mr. Turk about Mattice's whereabouts.  It is also undisputed that the Individual Defendants had an arrest warrant for fugitive Mattice, but did not have a warrant to search Plaintiffs' home.  The parties dispute whether Mrs. Turk consented to the officers' entry into the house.  TFO Stasenko recalls that Mrs. Turk opened the front door and said words to the effect of "come inside, I have neighbors."  (Doc. 107-5, Stasenko Decl., at ¶ 12.)  In contrast, Plaintiffs claim that no one asked permission to enter the home, and neither Mr. Turk nor Mrs. Turk gave any such permission.  According to Plaintiffs, the Individual Defendants simply barged in. (Doc. 115-3, J. Turk Aff., at ¶ 12.)[22]  These allegations, if true, would be a violation of Plaintiffs' Fourth Amendment rights.

The parties agree that the audio recording of the encounter begins after the initial communications between the parties.  That said, the tape captures the bulk of the encounter, particularly in light of Mr. Turk's testimony that "there's a delay for a few seconds before [the tape] starts recording."  (Doc. 107-4 at 67:4-7.)  The recording begins with Mrs. Turk telling the officers to "go through the entire house" and to get off the front lawn.  The Individual Defendants contend these statements were a continuation of Mrs. Turk inviting them inside, while Mrs. Turk asserts that it was not until "after agents entered the foyer and the front door was already closed," that she told the officers to get off the front lawn.  (Doc. 115-2, Mrs. Turk Aff., at ¶ 21.)

The facts before the Court present a close call.  Viewing the evidence in the light most

---

[22]Specifically, Mr. Turk avers that:

Stasenko and the other Defendants at the door did not ask for permission to enter the home.  Neither my spouse nor myself, either by words or conduct, gave permission to law enforcement to enter our home.  We never had the opportunity to give permission, even if we wanted to, as Defendants simply barged in.

(Doc. 115-3 at ¶ 12.)

favorable to Plaintiffs, and construing all reasonable inferences in Plaintiffs' favor, as required, there is a genuine issue of material fact as to whether the Individual Defendants had consent to enter the residence.  While the Individual Defendants claim that Mrs. Turk invited them into the home, Plaintiffs contend that the officers barged in as Mr. Turk was unlocking the door.  Because Plaintiffs' version of the facts, if true, demonstrate a Fourth Amendment violation, Plaintiffs have satisfied the first prong of the qualified immunity test.  *See Carpenter v. Bowling*, 276 Fed. Appx. 423, 425 (6th Cir. 2008) (affirming the district court's denial of summary judgment on the plaintiffs' unlawful entry claim where the "record establishes a dispute over whether the officers indeed had consent to enter the home," and plaintiffs alleged that the officers "forced their way into the apartment").

Having found that the Plaintiffs sufficiently alleged a constitutional violation with respect to the Individual Defendants' initial entry into the Turks' home, the Court moves to the second stage of the qualified immunity inquiry: determining whether the violated right was clearly established. There is a question of fact as to whether the Defendants' obtained consent to enter the Turks' home. Assuming, as Plaintiffs allege, that consent was lacking, the Defendants are not entitled to qualified immunity, because it is well-established that an officer cannot enter a person's home to search for a fugitive without a warrant, consent, or exigent circumstances.  *See Steagald*, 451 U.S. at 205-206 (finding that, "absent exigent circumstances or consent," a search warrant is required in order to "search for the subject of an arrest warrant in the home of a third party").  Accordingly, based on the current record before the Court, the Individual Defendants are not entitled to summary judgment on qualified immunity grounds with respect to Plaintiffs' unlawful entry claim.[23]

---

[23]It is unclear what cognizable harm Plaintiffs suffered as a result of the initial entry.  As previously noted, during the course of discovery in this case, Plaintiffs affirmatively waived any claim for emotional damages or distress and any claim for economic harm.  (Doc. 90 at 2.)  It is also clear that Plaintiffs are not seeking damages for any physical harm because no such harm is

B.     **Search of the Turk Residence**

Although the record is clear that Mrs. Turk consented to the search of Plaintiffs' home, the parties dispute whether her consent was voluntary.  First, Plaintiffs argue that all conduct stemming from the unlawful initial entry was, in turn, unlawful, thereby rendering any subsequent consent "irrelevant and not valid."  (Doc. 115 at 26.)  Second, Plaintiffs claim that any subsequent consent was invalid because it was obtained under duress and over Mr. Turk's objections.  The Court addresses each argument in turn.

1.     **Whether the Initial Entry Tainted Plaintiffs' Subsequent Consent**

Plaintiffs argue that Mrs. Turk's statements giving consent to search "occurred after Defendants were already in the home conducting the search and are, therefore, irrelevant."  (Doc. 115 at 20.)  In other words, Plaintiffs contend that Mrs. Turk's consent was tainted by the officer's initial unlawful entry into the home.   (*See also id.* at 26) ("All conduct by Defendants that flowed from the illegal entry was, in turn, illegal.").

As the Individual Defendants correctly note, however, the exclusionary rule applicable in criminal cases does not apply in civil rights cases.  *See Chatman v. Slagle*, 107 F.3d 380, 382 (6th Cir. 1997); *see also Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999) (noting that the fruit of the poisonous tree doctrine is not applicable in a § 1983 case); *see also Padilla v. Miller*, 143 F.Supp.2d 479, *30 (M.D. Pa. 2001) ("[T]he courts that have addressed the issue have uniformly concluded that the exclusionary rule is not applicable in a § 1983 action.") (collecting cases).  The purpose of the exclusionary rule "is to prevent the admission of evidence at trial . . . not to define constitutional rights or violations."  *Reich v. Minnicus*, 886 F.Supp. 674, 681-82 (S.D. Ind. 1993).

---

alleged.

25

While the exclusionary rule applies the principles of taint and attenuation, a civil action brought under § 1983, "employs the principle of proximate causation." *Townes*, 176 F.3d at 146; *Reich*, 886 F.Supp. at 685 (noting that "[t]he two are not identical").  Indeed, courts have found that, in a § 1983 case, "constitutionally invalid police conduct that by itself causes little or no harm is assessed on ordinary principles of tort causation and entails little or nominal damages.  The fruit of the poisonous tree doctrine is not available to elongate the chain of causation." *Townes*, 176 F.3d at 146.

A plaintiff who "suffers a constitutional deprivation early-on may, under § 1983, recover for his later injuries, even during later constitutional stages in the process, if the injuries are reasonably foreseeable consequences of the earlier deprivation of rights." *Reich*, 886 F.Supp. at 685.[24] Applying this analysis, courts have noted that the legality of an initial entry is but one factor which might be considered in determining the validity of subsequent consent to search. *Id*. at 685-86.

Although there is a factual dispute regarding whether the officers had consent for their initial entry into the Turks' home, resolution of this dispute is not necessary to the Court's analysis as to the subsequent search of the Turk residence.  Even if Mrs. Turk did not consent to the initial entry of the home, an initial unlawful entry is only one factor relevant to whether her subsequent consent

---

[24]In *Reich*, the court noted that:

Suppressing all evidence of the plaintiff's free and voluntary consent in this case, therefore, would have the unconscionable effect of holding the defendants liable in damages for their *constitutional* post-consent searches and seizures solely because of the alleged initial unlawful entry for which they would necessarily already have been held liable in damages.  Such a result would constitute not only a needless double deterrent but a recovery, for constitutional conduct, which is not authorized under § 1983.

886 F.Supp. at 682-83 (emphasis in original).

26

to search was voluntary.   As discussed below, moreover, considering the totality of the circumstances, a reasonable officer in the Individual Defendants' position could have believed that Plaintiffs' consent to search was voluntary.

### 2.        Voluntariness of Plaintiffs' Consent to Search

According to Plaintiffs, Mrs. Turk's consent was the product of "intimidation, threats and coercion," and Mr. Turk objected to the search.  (Doc. 115 at 21-24.)  In contrast, the Individual Defendants contend that "the Turks gave explicit verbal consent on multiple occasions," and that, under the circumstances, it was reasonable for the TFOs to believe that the Turks' words and conduct provided valid consent.  (*See* Doc. 107-1 at 26.)

Consent is voluntary, and therefore valid, when it is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion."  *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (citation omitted).  To determine whether consent was voluntary, courts consider the following factors: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police."  *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (internal citation omitted).  No single factor is determinative.  *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988).

To show duress or coercion, which is what Plaintiffs allege here, they "must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police."  *Ivy,* 165 F.3d at 403-404 (consent involuntary where the officers handcuffed the suspect's girlfriend to a table, took away their child, and threatened to place the child in government custody if consent was not forthcoming).  Typically, duress or coercion "involves actual or threatened physical mistreatment, violence, threats, promises, inducements, deception, trickery, or the overbearing of the

will of a party with limited mental capacity." *Norwood v. Thompson*, No. 2:05-cv-904, 2006 U.S. Dist. LEXIS 18027, *11 (S.D. Ohio Mar. 30, 2006); *see also Blake v. Knieper*, No. 03-74097, 2009 U.S. Dist. LEXIS *17-22 (E.D. Mich. June 16, 2009) (finding no genuine issue of material fact as to the voluntariness of consent where the plaintiff "urged" the officers to search and there was no evidence of mental deficiency. "[T]hat Plaintiff was in custody, had one arm in handcuffs, and had been detained for several hours does not vitiate the voluntariness of his consent.").

Here, the record reveals that Mrs. Turk expressly consented to the search of Plaintiffs' home when she initially told the officers to "go through the entire house," and repeatedly told them to search and then leave.  Although Mrs. Turk testified that she felt she had no choice but to let the officer search so that they would leave, the relevant inquiry is objective in nature.  *See Aquino,* 158 Fed Appx. at 673.  Regardless of Mrs. Turk's subjective motivation, her outward statements to the officers and conduct in leading them through her home could lead a reasonable officer to believe that consent was freely given.

Plaintiffs argue that Mrs. Turk's consent was under duress because Mr. Turk was denied permission to move around his home and was threatened with arrest.  (Doc. 115 at 21.)  Although it is undisputed that Mr. Turk's was required to stay in the foyer of his home while the officers searched for Mattice, this brief limitation does not require a finding of coerced consent on Mrs. Turk's behalf.  *See Morphis v. United States*, 110 Fed. Appx. 527, 531 (6th Cir. 2004) (citing *United States v. Burns*, 298 F.3d 523, 541 (6th Cir. 2002) ("[T]he fact that Appellant's movements may have been limited briefly is of no consequence here, as the focus is on whether there was voluntary consent.  A seizure or unlawful restraint alone does not mandate a finding of coerced consent.").

Consideration of the factors surrounding Mrs. Turk's consent support a conclusion that it was voluntarily given.  From the record in this case, it is clear that the Turks are mature, educated adults

28

who are familiar with their rights.  Certainly, Mr. Turk, a private investigator and former police officer, is familiar with the criminal justice system, and he specifically testified that he knew his rights.  (Doc. 107-4 at 81:4-5.)  As a resident of the home, Mrs. Turk had actual authority to consent to the search, and there is no indication that she was impaired at the time she gave the officers consent.  She was not detained, and, in fact, Mrs. Turk accompanied the officers through the house.  Indeed, no one was handcuffed or placed under arrest.  It is undisputed, moreover, that the entire incident took roughly thirty minutes, during which Mr. Turk spoke with his attorney twice via telephone.

Although the officers had weapons that were visible in their holsters, Plaintiffs concede that no one pointed or otherwise brandished their firearms during the encounter.  The only potentially coercive conduct was when the officers threatened Mr. Turk with arrest if he lied to them, and threatened to tell the neighbors that they were harboring a fugitive.  These statements alone are insufficient to render Mrs. Turk's consent involuntary.  *See United States v. Miles*, 16 Fed. Appx. 845, 849 (10th Cir. 2001) (noting that an officer informing someone that she could be arrested for harboring a fugitive if she was lying about his presence in the apartment, "[e]ven generously construed as a threat . . . was not the type of threat that negates an otherwise voluntary consent").

Plaintiffs next argue that Mr. Turk objected to the officers' search of his home.  (Doc. 115 at 24.)  The Individual Defendants claim that Mr. Turk's "conduct and words belie this assertion, however, as he did not tell the officers to leave until they finished their search and he had obtained all of their personal information and threatened to sue them."  (Doc. 121 at 6.)

Where two occupants are present and one consents to a search while the other is silent, the officers can rely on the consent as long as the consenting individual has actual or apparent common authority over the room.  *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008).  In contrast,

"a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006) (finding that the search was invalid as to the husband where he "unequivocally refused" to allow the officers to search while his wife "readily gave" consent to search).

Plaintiffs argue that Mr. Turk objected to the search by telling the officers to "wait a minute" but that he was silenced by threats of arrest. (Doc. 115 at 23.) Considering the totality of the circumstances, however, no reasonable officer would have concluded that Mr. Turk objected to the search. As noted, Mrs. Turk expressly consented to the search, and Mr. Turk assented by saying "that's fine" when TFO Stasenko told him "she said we could search around, we're going to take a look, make sure he's not here." (Doc. 107-12 at 5:14-21.) While TFO Stasenko was on the phone with Mr. Turk's attorney, Mrs. Turk repeatedly told the officers to go through the house. Although at that time, Mr. Turk told his wife to, "wait a minute, wait. Wait until he's done talking to Ed," Mrs. Turk testified that she did not listen, and instead, she proceeded to lead the search because she wanted the officers to leave. (Doc. 107-3 at 57:2-58:2.) At another point, Mrs. Turk told Mr. Turk to stop talking, and told the officers to "please go search and . . . get out of my house." (Doc. 107-12 at 8:3-20.)

Throughout the encounter, moreover, Mr. Turk informed the officers that they were "going to be very cooperative," offered coffee to the officers, and told his wife: "Beth, they're just doing their job, they're mistaken." (Doc. 107-12 at 5:14-15; 11:19-25.) Although Mr. Turk testified that he was being sarcastic when he offered coffee to the officers, the facts surrounding the consent must be viewed from the perspective of an objectively reasonable officer under the circumstances. The focus is not on the Plaintiffs' subjective motivation and/or understanding of the situation. Under these circumstances, a reasonable officer could conclude that the Turks' consented to the search,

30

particularly since no one made an unequivocal statement revoking consent.[25]

Examining the totality of the circumstances, the Court finds that there are no genuine issues of material fact as to whether the search of the house was made with Mrs. Turk's express and voluntary consent. Because the search was consensual, it did not violate Plaintiffs' constitutional rights. The Court concludes, therefore, that the Individual Defendants are entitled to qualified immunity on Plaintiffs' unreasonable search claims.

Even assuming *arguendo* that the Individual Defendants violated Plaintiffs' Fourth Amendment rights by searching the house, the Individual Defendants are nonetheless entitled to qualified immunity under the "clearly established" prong of the qualified immunity analysis. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The question, therefore, is not whether the Individual Defendants were correct in their belief that Plaintiffs had consented to the search, but whether they could have reasonably believed, under the circumstances, that they had obtained Plaintiffs' consent to search. *See Anderson*, 483 U.S. at 641 ("The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of the clearly established law and the information the searching officers possessed.").

Plaintiffs have presented no case clearly establishing that consent to search would be found

_____

[25]It is well-established that a consenting party can revoke consent. *United States v. Buckingham*, 433 F.3d 508, 513 (6th Cir. 2006) (quoting *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999)). "It is equally clear, however, that the precision with which such a retraction must be expressed is to be judged against at least the same standard - objective reasonableness - which would apply to the initial grant." *United States v. Jimenez*, No. 08cr101, 2009 U.S. Dist. LEXIS 80410, *12 (E.D. Tenn. Sept. 2, 2009).

involuntary under the circumstances at issue here.  Given the circumstances described above, the Court finds that reasonable law enforcement officials in the Defendants' position would have believed they had valid consent to search the Plaintiffs' home for Mattice.  As noted, Mrs. Turk repeatedly told the officers to search the home, Mr. Turk said they were going to cooperate, and neither specifically revoked their consent.  In addition, it is undisputed that none of the officers brandished their firearms, and no one was handcuffed during the encounter.

Because the Defendants reasonably thought they had consent to search, no clearly established violation of the Fourth Amendment occurred.  *See Restaino v. Illinois State Police,* No. 04-2198, 2006 U.S. Dist. LEXIS 7214, *14-16 (C.D. Ill. Jan. 31, 2006) (finding that, based on the evidence, "a reasonable officer could have concluded Restaino consented to the search of his home"); *see also Johnson v. Wild Acres Lakes Prop. & Homeowners Assoc.*, No. 3:07-cv-1384, 2009 U.S. Dist. LEXIS 68641, *27-30 (M.D. Pa. Aug. 6, 2009) (granting defendants' motion for summary judgment as to plaintiff's unreasonable search claim on qualified immunity grounds where, based on the totality of the circumstances, a reasonable person in the officer's position "could have believed that he obtained Plaintiff's valid consent to search his vehicle"); *see also Krug v. County of Rennselaer*, No. 1:04-cv-640, 2010 U.S. Dist. LEXIS 106228, *14 (N.D.N.Y. Oct. 5, 2010) (finding that, although plaintiff alleged she felt coerced into consenting, there "was insufficient evidence for [the officer] to doubt that [she] freely and voluntarily consented to the search of the vehicle").  Accordingly, the Individual Defendants are entitled to summary judgment on qualified immunity grounds because they reasonably believed Plaintiffs consented to the search.

### C.    Seizure of Mr. Turk

Finally, Plaintiffs allege their Fourth Amendment rights were violated when they were seized in their home.  (Doc. 60 at ¶¶ 18, 28.)  Although the language in the Amended Complaint is broad,

and suggests that all of the Plaintiffs were unlawfully seized during the encounter at their home, in their responsive briefing, Plaintiffs clarify that this claim is limited to Mr. Turk.  Specifically, Plaintiffs allege that the officers unlawfully detained Mr. Turk in his foyer.[26]  Plaintiffs further contend that, because the Defendants were illegally in the home, "[a]ll conduct by Defendants that flowed from the illegal entry was, in turn, illegal."  (Doc. 115 at 26.)[27]  The Individual Defendants argue that Mr. Turk's brief detention was permissible because it was incident to a valid consent search.[28]  (Doc. 107-1 at 33.)  The Court finds Defendants' argument well-taken.

Under the Fourth Amendment, an individual is "seized" when, "by means of physical force or a show of authority, his freedom of movement is restrained."  *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  An individual's freedom of movement is restrained when "in view of all of the circumstances . . . a reasonable person would have believed that he was not free to leave."  *Id.* at 554.  Under this standard, courts consider "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  *Id.*

---

[26]The record is clear that Mrs. Turk and her children were not physically touched and were free to move around the home.  Indeed, Mrs. Turk led the officers around during the search for Mattice.

[27]As discussed in the preceding section, Plaintiffs' argument that the Defendants' conduct was tainted by the initial unlawful entry does not apply in § 1983 or *Bivens* cases.

[28]In the alternative, the Individual Defendants argue that they had probable cause to believe Mr. Turk was lying to impede their efforts to apprehend Mattice.  Specifically, Defendants argue that, because "Turk tried to trick the officers, [and] did not reveal the contact he had with Mattice," TFO Stasenko had probable cause to arrest Mr. Turk "because [he] was aware when he detained Turk that Turk had falsely claimed not to have knowledge about Mattice." (Doc. 107-1 at 37.)  As such, the Defendants argue, their search of the home was incident to a lawful arrest or detention.  Because the Court concludes that the Individual Defendants had consent to search Plaintiffs' home, which, as discussed herein, includes a right to briefly detain occupants of the home while the search is carried out, the Court need not, and does not, address Defendants' alternative argument that the seizure was supported by probable cause.

Law enforcement officers have a limited authority to detain occupants of a residence while a valid search is conducted. *Michigan v. Summers*, 452 U.S. 692, 702-703 (1981); *see also Duncan v. Jackson,* 243 Fed. Appx. 890, 896 (6th Cir. 2007) ("An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.") (quotation omitted); *see also United States v. Bohannon*, 225 F.3d 615, 616 (6th Cir. 2000) ("Law enforcement officers have a limited authority to detain occupants of a premises while a proper search is being conducted."). In *Summers*, the Court justified detention of an occupant during a valid search on the basis that it supports law enforcement interests in: (1) preventing flight; (2) reducing the risk of harm to the officers; and (3) conducting an orderly search of the premises. *Summers*, 452 U.S. at 701-703.

Although in *Summers*, the officers had a warrant to search the house, courts have extended the reasoning from that case to permit brief detentions of occupants while the officers conduct a consensual search.[29]  *United States v. Bowers*, No. 8:05CR294, 2006 U.S. Dist. LEXIS 35756, *10-11 (D. Neb. Feb. 3, 2006) ("The Eighth Circuit, among others, has applied the *Summers* rule and rationale to consensual searches."); *see United States v. Hernandez-Hernandez*, 327 F.3d 703, 706 (8th Cir. 2003) ("Although the agents briefly detained Hernandez-Hernandez at his home while conducting the consensual search, the facts do not show they restrained him to a degree associated with formal arrest."); *see also United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993) (finding that, where the officers had consent to enter, the defendant was not unreasonably detained when he

---

[29]In *Summers*, moreover, the Court stated that: "[t]he fact that our holding today deals with a case in which the police had a warrant does not, of course, preclude the possibility that comparable police conduct may be justified by exigent circumstances in the absence of a warrant. No such question, however, is presented by this case." *Summers*, 452 U.S. at 703 n. 17. In other words, the Court specifically contemplated that its holding could apply in circumstances where the officers do not have a warrant but have an exception to the warrant requirement.

34

was placed against the wall because the defendant was not handcuffed and the "officers needed to find out for their own safety whether other people were in the apartment").

There are no allegations that Defendants Rexing, Adams, or Comerford played any role in the alleged detention of Mr. Turk.  Because there are no allegations that these officers were personally involved in the alleged seizure, they are protected by qualified immunity and are entitled to summary judgment.  *See Walters v. Stafford*, 317 Fed. Appx. 479, 487 (6th Cir. 2009) (finding that an officer was entitled to qualified immunity as to the plaintiff's Fourth Amendment illegal seizure claim because there was no evidence the officer personally handcuffed, transported, or detained the plaintiff).

The record reveals, however, that Mr. Turk was briefly detained in his foyer by TFO Stasenko while Mrs. Turk led other officers through the house:

> MR. TURK:    Am I under arrest?
>
> OFFICER:     Not right now.
>
> MR. TURK:    Well, then, can I walk through my house?
>
> OFFICER:     Not yet, not until we're done securing the place, okay.
>
> *       *       *
>
> MR. TURK:    Just tell me what I can do by legal law.  Can I walk in my other room or not?
>
> OFFICER:     And I said no.
>
> MR. TURK:    Okay, so I'm being detained.
>
> OFFICER:     You're not being detained.

(Doc. 107-12 at 13:4-9, 13:16-23.) Although TFO Stasenko grabbed Mr. Turk's wrist, Mr. Turk was

never arrested or handcuffed.[30]  No weapons were pointed at Mr. Turk during his brief detention, and he was permitted to speak with his attorney twice via telephone.

Assuming Mr. Turk was seized, the question becomes whether the seizure was reasonable under the circumstances.  As discussed above, the Individual Defendants' search of the Plaintiffs' home was pursuant to voluntary consent.  Mrs. Turk specifically told the officers they could search the house for fugitive Mattice.  Accordingly, the Court concludes that Mr. Turk's limited detention was incident to a consensual search and therefore did not violate his Fourth Amendment rights.

In any event, the Court finds that a reasonable officer confronted with the same facts and circumstances facing TFO Stasenko could believe it was permissible to briefly detain Mr. Turk during the consensual search.  Plaintiffs cannot demonstrate that Stasenko's conduct was contrary to clearly established law because there is case law permitting the brief detention of occupants during consent searches.  *See Bowers*, 2006 U.S. Dist. LEXIS 35756, at *10-11; *Hernandez-Hernandez*, 327 F.3d at 706; *Garcia*, 997 F.2d at 1282.  Accordingly, the Court finds that the Individual Defendants are entitled to qualified immunity as it relates to the alleged seizure of Mr. Turk.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 107) is **GRANTED** in part, and **DENIED** in part.  Specifically, the Court concludes that the Individual Defendants' Motion for Summary Judgment based on qualified immunity as to Plaintiffs' unlawful entry claim is **DENIED**.  Defendants' Motion is **GRANTED**, however, as to Plaintiffs subsequent search and seizure claims.

---

[30]The parties disagree as to how long TFO Stasenko held onto Mr. Turk's wrist.  While Mr. Turk testified that Stasenko held him for the bulk of the time he was detained, Stasenko contends that he "momentarily grabbed [his] arm to get his attention."  (*Compare* Doc. 107-4 at 45:9-17 *with* Doc. 107-5 at ¶ 15.)

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY***

**Dated: January 14, 2011**

*\* United States Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.*