**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **JAMES TURK, et al.,** ) | Case No. 1:09-CV-868 |
| ) | |
| **Plaintiffs,** ) | **Judge Dan Aaron Polster** |
| ) | |
| vs. ) | **MEMORANDUM OF OPINION** |
| ) | **AND ORDER** |
| **DANIEL COMERFORD, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

Before the Court is the Motion for Reconsideration of the Court's January 14, 2011 Memorandum of Opinion and Order or Alternatively Second Motion for Summary Judgment filed by Defendants Daniel Comerford, Mark Adams, Nick Rexling, and Jason Stasenko (collectively "Defendants" for purposes of this motion) (**Doc #: 126**). For the reasons discussed, *infra*, the Court hereby **GRANTS** Defendants' Motion and **GRANTS** summary judgment in favor of Defendants.

**I.**

The Court's January 14, 2011 Memorandum of Opinion and Order ("January 14

Order")[1] describes the factual background in extensive detail. (Doc #: 125 at 1-12.) The following are the critical facts for purposes of ruling on this motion. On February 17, 2009, Defendants, who were members of an FBI administered task force - the Cleveland/Cuyahoga Fugitive/Gang Task Force (the "Task Force") - entered Plaintiffs' home without a search warrant. Defendants were looking for a fugitive named John Mattice, who failed to appear for a court hearing after being arrested for rape. (Doc #: 107-5 at ¶3.) Upon visiting Mattice's last known address and subsequently receiving a call from Mattice's ex-girlfriend, the Task Force determined that Plaintiff John Turk, a private investigator retained by Mattice's attorney Ed Heffernen, had met with Mattice on February 13, 2009. (*Id.* at ¶¶3-4, 6.) Because Mr. Turk was the last person reported to be seen with Mattice, the Task Force went to his house on February 17, 2009, to question Mr. Turk and search for Mattice. (*Id.* at ¶10.) The Task Force had an arrest warrant for Mattice but did not have a warrant to search the Turks' home.

Upon arrival at the Turks' home, Defendants Comerford and Rexing proceeded to the back of the house and the side of the house, respectively, to secure the perimeter in case Mattice was present and tried to escape. (Doc #: 107-11 at ¶6; Doc #: 107-9 at ¶7.) The other two officers knocked on the front door and Stasenko yelled for Mr. Turk to open the door.

The door opened, though the parties disagree on who opened it. Defendants assert that Ms. Turk opened the door and let Defendants Stasenko and Adams into the foyer, stating "come inside, I have neighbors." (Doc #: 107-5 at ¶12.) Plaintiffs contend that as Mr. Turk attempted to unlatch the deadbolt on the door the officers pushed their way into the foyer of the

---

[1] The January 14 Order was issued by the Hon. Kathleen O'Malley, who is now a judge on the United States Court of Appeals for the Federal Circuit. On February 4, 2011, this case was transferred from Judge O'Malley to the undersigned, pursuant to General Order 2011-3.

home. (Doc #: 107-3 at 47:2-11[2].) Plaintiffs further claim that Ms. Turk did not speak to the officers until after they were already in the foyer of the home. (Doc #: 115-2 at ¶9.)

Once the door opened, Stasenko entered the foyer first, immediately followed by Adams.[3] Stasenko then radioed Comerford to come into the home. (Doc #: 107-4 at 47:23-48:15.) Comerford entered the home several minutes later. (*Id*.) Rexing also entered the home, though Plaintiffs claim he entered with Stasenko and Adams (Doc #:107-3 at 48:5-12), while Defendants claim that he entered the home much later. (Doc #: 126-3 at ¶5.)

After entering, the officers asked Mr. Turk to put the family dog away. (Doc #: 107-3 at 48:13-20.) Ms. Turk then stated "[g]o through the entire house" and told the officers to "[g]et your people out of my front lawn." (Doc#: 107-12 at 2:9-15.) Mr. Turk repeated the phrase "[w]ait a minute" three times before Stasenko escorted him toward the back of the foyer, away from Ms. Turk. (Id.; Doc #: 115-3 at ¶16.) Stasenko then explained that the Task Force was at the Turks' home because Mr. Turk had recently been seen with Mattice. (Doc #: 107-12 at 3:11-20.) As this was taking place, Ms. Turk again stated that the officers could "[g]o through my house." (Id.) Shortly after, Mr. Turk stated that it was "fine" for the officers to search around and that the Turks were "going to be very cooperative." (Doc #: 107-12 at 5:14-21.) However, Mr. Turk subsequently asked to see a search warrant. (Id. at 7:8-22.) After being told that the officers had an arrest warrant for Mattice but no search warrant for the home, Ms. Turk

---

[2]Citations correspond to the page number of the Court filing, rather than other page numbers listed on the document. For example, this citation is found on page 47 of Doc #: 107-3 (exhibit attaching the bulk of Ms. Turk's deposition transcript) which corresponds to page 55 of the actual deposition transcript.

[3]Entering with Adams was Task Force Officer Chapman, who was voluntarily dismissed from this case on December 18, 2009.

told her husband to stop talking. (Id. at 8:3-7.) She called attorney Heffernan and gave the phone to Mr. Turk. (Doc #: 107-3 at 57:2-58:12.) While Mr. Turk was on the phone with Heffernan, Ms. Turk began showing the officers around the house. (*Id.*) Mr. Turk then invited Stasenko to speak with Heffernan. Stasenko proceeded to explain why the Task Force was at the Turks' home. (Doc #: 107-12 at 14:9-15:14.) Ms. Turk continued to tell the officers to search the house. (Doc #: 107-12 at 9:25-11:1.) Mr. Turk remained in the foyer with Stasenko. (Doc #: 107-4 at 44:12-18.) Heffernan was then called a second time. Comerford spoke with Heffernan and learned that Mattice would be attending an arraignment scheduled for later that afternoon. (Doc #: 107-11 at ¶7.) The officers told Heffernan and Mr. Turk that if Mattice did not show up for the arraignment they would need the two of them to come downtown that afternoon to answer more questions. The encounter lasted approximately thirty minutes.

On April 17, 2009, Plaintiffs filed a complaint alleging eleven causes of action. (Doc #: 1.) Plaintiffs filed an amended complaint on October 19, 2009, reducing their asserted claims to: (1) unconstitutional search and seizure in violation of the Fourth Amendment against Defendants (Count I); (2) failure to train and supervise against the Cuyahoga Metropolitan Housing Authority ("CMHA") and the Cuyahoga County Sheriff (Count II); (3) illegal policy and customs against CMHA and Cuyahoga County; and (4) violation of a constitutional right by federal agents acting under color of law, pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against Defendants (Count IV). (Doc #: 60.) The Court granted Plaintiffs' Motion to Voluntarily Dismiss CMHA on December 18, 2009.

On June 30, 2010, Defendants and Cuyahoga County separately moved for summary judgment. (Doc ##: 106, 107.) Plaintiffs opposed Defendants' motion and voluntarily

dismissed Cuyahoga County on August 23, 2010. (Doc ##: 115, 116.) Defendants filed a reply to Plaintiffs' opposition on September 28, 2010. (Doc #: 121.)

On January 14, 2011, the Court issued its ruling on Defendants' motion for summary judgment. (Doc #: 125.) The Court held that because CMHA and Cuyahoga County had been dismissed from the litigation, Counts II and III were not cognizable causes of action. (*Id*. at 14.) The Court further determined that Count I, a 42 U.S.C. §1983 claim against state officials, was not applicable because Defendants had been deputized as federal officers and were acting within the scope of their federal duties during the incident in question. (*Id*.)

With respect to Count IV, the only remaining claim, the Court granted in part and denied in part Defendants' motion for summary judgement. Specifically, the Court held that Defendants were not entitled to summary judgment on qualified immunity grounds for initially entering Plaintiffs' home without a warrant. (*Id*. at 19-24.) However, the Court granted summary judgment on qualified immunity grounds for Defendants' search of Plaintiffs' home subsequent to the initial entry. (*Id*. at 25-32.)

On February 11, 2011, Defendants filed the instant Motion for Reconsideration or, alternatively, Second Motion for Summary Judgment, arguing that the Court erred in failing to find that qualified immunity protects Defendants' initial entry into the Turks' residence. (Doc #: 126.) Plaintiffs opposed Defendants' motion on March 16, 2011. (Doc #: 127.) Defendants replied on April 18, 2011. (Doc #: 128.)

**II.**

Defendants have raised this motion to reconsider under Federal Rules of Civil Procedure 54(b), 56(b), and 59(e). Rule 54(b) states that "any order or other decision ... that

adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties ... may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Rule 59(e) states that "a motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."  Finally, Rule 56(b) permits filing of a motion for summary judgment "at any time until 30 days after the close of all discovery."

"A motion for reconsideration under Fed. R. Civ. P. 59(e) may be granted if there is clear error of law, newly discovered evidence, an intervening change in the controlling law, or to prevent manifest injustice." *Johnson v. Interstate Brands Corp.*, 351 Fed App'x 36, 38 (6th Cir. 2009) (citing *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999).)  However, Rule 59(e) does not apply to denials of summary judgment because the denial does not constitute a final judgment. *Cameron v. Ohio*, 344 Fed. App'x 115, 117-18 (6th Cir. 2009) (citing *Russell v. GTE Gov't Sys. Corp.*, 141 Fed. App'x 429, 436 (6th Cir. 2005).)   Rather, where a motion seeks reconsideration of a denial of summary judgment, the court treats the motion as a renewed motion for summary judgment and is "therefore free to reconsider or reverse its decision for any reason." *Id*. at 118.  Reconsideration is warranted here because the undersigned comes to a different conclusion than did Judge O'Malley on the question of whether Defendants' actions in entering the home were objectively reasonable given the information they possessed.

"Government officials performing discretionary functions generally are shielded for liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In assessing qualified immunity, the court, viewing the facts in the light most favorable to the plaintiff, must determine: (1) whether a constitutional right

-6-

has been violated; and (2) whether the constitutional right at issue was "clearly established at the time of defendant's alleged misconduct." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001).) "The standard is one of objective reasonableness, analyzing claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendants' position could have believed that his conduct was lawful, in light of clearly established law and the information he possessed." *Nader v. Blackwell*, 545 F.3d 459, 476 (6th Cir. 2008) (citing *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995). Thus, qualified immunity applies unless "any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987).

The Fourth Amendment requires police to obtain a warrant based upon a judicial determination of probable cause prior to entering a home. *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003). "One 'well-delineated exception' to this rule turns on consent, as '[a]n officer with consent' does not need a warrant 'to conduct a constitutional search.'" *United States v. Ammons*, No. 09-5003, 2011 WL 1130447 at \*4 (6th Cir. March 28, 2011) (citing *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996).)

In what she termed a "close call," Judge O'Malley held in her January 14 Order that Defendants were not entitled to qualified immunity for their warrantless entry into the foyer because there was a genuine issue of material fact whether they had consent to enter the Turks' residence. (Doc #: 125 at 23-24.) Reconsidering the undisputed facts, however, the Court now concludes that all four officers are protected by qualified immunity, and accordingly, summary judgment should be awarded in their favor.

Stasenko and Adams had an objectively reasonable belief that they had consent to

-7-

enter the Turks' home. The only fact in dispute with regard to their entry is whether Ms. Turk opened the door to allow the officers into the foyer, as asserted by Defendants, or whether Stasenko pushed open the door himself. Both Mr. and Ms. Turk acknowledge that after the officers knocked on the door, Mr. Turk started unlocking the deadbolt on the door. With regard to the door opening, Ms. Turk stated that "maybe [the door] was pushed" by the officers. (Doc #: 107-3 at 55:4-15.) Mr. Turk claimed that he "got splinters coming off of [the deadbolt] when the door [was] forced open" and that "[s]omebody shoved that door open in my face." (Doc #: 107-4 at 87:1-11.) Mr. and Ms. Turk agree that the officers then entered into the foyer of their home. Neither testified that they objected to the officers entering their home before or after the door opened. Plaintiffs and Defendants all agree that, shortly after the officers told Ms. Turk they needed to search the house for Mattice, Ms. Turk provided consent for the officers to conduct their search.

The Turks' version of these facts, as seen from the perspective of Stasenko and Adams, consists of the officers knocking on the door followed by a resident of the home beginning to unlock the deadbolt on the door without expressing any objection. The officers then pushed open the door and entered into the foyer, without advancing further. Neither Mr. or Ms. Turk verbally objected to the officers' entry into the house or to their presence in the foyer. After a very brief conversation, Ms. Turk then provided consent to search the home.

Considering the totality of the circumstances from the officers' perspective, the Turks gave implied consent to enter their home. While entry without a warrant is presumed unreasonable, *Payton v. New York*, 445 U.S. 573, 586 (1980), here, the officers experienced someone beginning to unlock the door after they knocked and requested the door be opened. The officers entered the foyer without proceeding further, and engaged in conversation with Mr. and

-8-

Ms. Turk. Neither Mr. or Ms. Turk objected in any way to their presence in the foyer; to the contrary, Ms. Turk soon consented to the officers searching the home. The only evidence in the record indicating that the Turks did not consent to the entry into the foyer is the Turks' after-the-fact testimony regarding their state of mind. However, for purposes of qualified immunity, the relevant inquiry focuses on what was done and said at the time of the entry, and what a reasonable officer could have concluded. The officers' belief that they had consent to enter into the foyer was reasonable because they "could have believed that [their] conduct was lawful, in light of clearly established law and the information [they] possessed." *Nader*, 545 F.3d at 476. Stasenko and Adams are therefore entitled to qualified immunity.

Similarly, Rexing and Comerford must be granted qualified immunity. The parties do not dispute that Comerford entered the house several minutes after the initial entry. As a subsequently entering officer, Comerford is immune from liability under §1983, unless he knew that the initial entry by the other officers was unlawful. *Sargent v. City of Toledo Police Dept.*, 150 Fed. App'x 470, 474 (6th Cir. 2005) ("no Fourth Amendment violation occurs when an officer follows a partner inside after the partner has already entered the home" unless the office knew the partner "entered the home without consent").) Plaintiffs have presented no evidence that Comerford had knowledge of an unlawful entry. With regard to Rexing, there is a factual dispute over whether he entered with Stasenko and Adams or entered the home after the initial entry. However, under either scenario he is protected by qualified immunity. If Rexing was part of the initial entry, he is immune for the reasons discussed with respect to Stasenko and Adams. If he entered subsequently, he is in the same position as Comerford, as Plaintiffs have not put forth any evidence that Rexing knew the initial entry was nonconsensual.

**III.**

For the reasons discussed, *supra*, the Court hereby **GRANTS** Defendants' Motion for Reconsideration (**Doc #: 126**) and hereby **GRANTS** Summary Judgment in favor of Defendants.  Accordingly, this action is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

 */s/ Dan A. Polster     May 17, 2011*
**Dan Aaron Polster**
**United States District Judge**